## McNabb et al. v. Central Kentucky Natural Gas Co. et al.

(Decided Jan. 21, 1938.)

C. F. SPENCER and WHEELER & WHEELER for appellants.
KIRK & WELLS for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE STITES—
Affirming.

This is an appeal·from a judgment of the Johnson circuit court sitting in equity. The petition alleges, and the proof shows, that on August 1, 1925, the appellee, Central Kentucky Natural Gas Company, contracted with the appellant to purchase gas at a price of 10 cents per thousand cubic feet from two wells on a lease in Johnson county, Ky., near Red Bush. The contract seems to have been embodied in a letter dated November 27, 1925, written by appellee's general manager, and reciting in part:

> "Your gas will be taken whenever and so long as our Red Bush compressor·plant is in operation."

Appellee continued to take the production of the two wells until October 22, 1929, at which time it cut off one of them and refused to take gas from it until February 18, 1931, when it again connected its gathering system with this well, and has ever since been·using gas from it. Appellants allege that the closed-off well was producing gas sufficient to pay them $85.20 per month, and in this suit they undertake to recover the sum of $1,000, which they allege to be the damages they have sustained by reason of the wrongful refusal to accept this gas.

The appellee, in avoidance of plaintiffs' claim, asserts that, during the period complained of, appellants' well was producing gas of a high sulphur content, which was unmarketable and in fact injurious to all of the gas flowing into appellee's lines from other wells. The proof indicates that, beginning in March, 1929, a number of complaints were made by appellee's customers in Lexington, Winchester, and Mount Sterling, because of the obnoxious odor of the gas then being furnished by appellee. By a process of elimination, and numerous tests, the sulphurous gas was traced to a well belonging to the Southeastern Gas Company, or the Carroll Oil & Gas Company, adjoining and but a few hundred feet away from the well of the appellants. It was shown that the Southeastern Gas Company well was drilled into the carniferous sands, which are somewhat deeper than the Weir sands into which appellants' well had been drilled. Complaints in regard to the sulphurous gas abated for several months after the Southeastern

Gas Company well was shut off, but in the space of a few months they commenced again. At this time a test was run on the well of the appellants, and it was shown to contain sulphur, and appellee thereupon, on October 29, 1929, suspended taking gas from this well.

At appellee's suggestion, the appellants demanded that the Southeastern Gas Company shut in, or pack, the offending well on its premises, and, also at appellee's suggestion, appellants permitted their well to "blow off"—that is, permitted the gas to escape into the air, where it was burned, in order to rid the well of the sulphurous gases which had evidently leaked into it from the Southeastern Gas Company property.

The facts are not seriously disputed, and, even if they were, the evidence amply supports the conclusion of the chancellor on this score. Appellants argue simply that it was the duty of the appellee, under its contract, to accept gas from their well and that there was no implied warranty that the gas so taken would be free of sulphur or even that it would be of marketable quality. This is really the only question in the case.

The appellant McNabb testified that he knew the use which was intended to be made of the gas at the time that he entered into the agreement to sell it. He knew that it was to be used for domestic purposes. Appellees introduced witness after witness who testified that the odor from sulphurous gas was disagreeable, and numerous witnesses stated that they would find some other fuel for lighting or heating their houses rather than to continue the use of the obnoxious gas. The evidence amply sustained the conclusion of the chancellor that the gas was commercially unmarketable.

The Uniform Sales Act, Kentucky Statutes, sec. 2651b-15, provides:

"Subject to the provisions of this act or any statute in that behalf, there is no implied warranty or condition as to quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufac-

turer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose. * * *

"(5) An implied warranty or condition as to the quality or fitness for a particular purpose may be annexed by the usage of trade.

"(6) An express warranty or condition does not negative a warranty or condition implied under this act unless inconsistent therewith. (1928, c. 148, p. 481, sec. 15.)"

The rule thus stated is declaratory of the common law existing prior to the adoption of the statute. Thus, in Louisville Grinding & Machine Company v. Southern Oil & Tar Company, 230 Ky. 39, 18 S. W. (2d) 877, 878, we said:

"If the seller knows what the buyer is going to do with the thing purchased, that is, if he is made acquainted with the intended use of the thing that he sells, there arises an implied warranty that the purchaser may rely on, to the effect that the article sold is fit for the purpose, under proper management and control, that the buyer desires to use it for."

It is obvious that this rule applies with peculiar force to the case here presented. The contract here was to buy gas, but it was marketable gas and not simply any vapor that might arise from appellants' well.

Judgment affirmed.